## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**JAMES ROBERT SHEWMAKE JR.,**

**Plaintiff,**

v.

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security,**

**Defendant.**

**No. 15 C 6734**

**Magistrate Judge Mary M. Rowland**

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff James Robert Shewmake Jr. filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq., 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI,[1] a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standards for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539

Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on May 12, 2010, alleging that he became disabled on June 1, 2009, because of Crohn's disease,[2] diabetes, high blood pressure, eye condition, hepatitis C, and stress-related anxiety. (R. at 35, 97, 108, 212–23). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 35, 97–100, 137). On September 27, 2011, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 35, 52–96 ). The ALJ also heard testimony from Grace Gianforte, a vocational expert (VE). (*Id.* at 35, 52–96, 198–99).

The ALJ denied Plaintiff's request for benefits on November 7, 2011. (R. at 35–45). The Appeals Council (AC) denied Plaintiff's request for review on July 19, 2012. (R. at 1–7). On June 12, 2014, this court reversed and remanded the ALJ's decision. *Shewmake v. Colvin*, No. 12 CV 6339, 2014 WL 2619659, at *1 (N.D. Ill. June 12, 2014) (Kim, J.).

In the meantime, on August 14, 2012, Plaintiff filed a subsequent application for DIB, alleging disability beginning on November 8, 2011. (R. at 791, 849, 893). On September 13, 2013, the ALJ issued a favorable determination, finding Plaintiff disabled commencing November 8, 2011. (*Id.* at 791, 849–59, 893). On September 2, 2014, the AC affirmed the disability decision beginning November 8, 2011, but determined that the period prior to November 8, 2011, required further administra-

---

[2] "Crohn''s disease is an inflammatory bowel disease (IBD). It causes inflammation of the lining of [an individual's] digestive tract, which can lead to abdominal pain, severe diarrhea, fatigue, weight loss and malnutrition." <http://www.mayoclinic.org/diseases-conditions/crohns-disease/basics/definition/con-20032061> (last visited August 25, 2016).

tive proceedings. (*Id.* at 791, 893). Therefore, the AC vacated the ALJ's November 7, 2011 decision and remanded to an ALJ for further proceedings consistent with the June 12, 2014 Opinion of this court. (*Id.*). On March 16, 2015, Plaintiff, represented by counsel, testified at a second hearing before an Administrative Law Judge (ALJ). (*Id.* at 791, 1070–105). The ALJ also heard testimony from GleeAnn L. Kehr, a vocational expert (VE). (*Id.* at 791, 1023, 1098–105).

The ALJ again denied Plaintiff's request for benefits on April 2, 2015. (R. at 791–808). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity from June 1, 2009, the alleged onset date, through November 7, 2011 (the relevant period). (*Id.* at 793–94). At step two, the ALJ found that during the relevant period, Plaintiff's Crohn's disease, hepatitis C, a spinal disorder, diabetes mellitus, and mood and anxiety disorders were severe impairments. (*Id.* at 794–95). At step three, the ALJ determined that during the relevant period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listings enumerated in the regulations. (*Id.* at 795–97).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[3] and determined that during the relevant period, he had the capacity to perform sedentary work, except that Plaintiff

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

was further limited to work requiring no climbing of ladders, ropes, and scaffolds, no more than frequent balancing, stooping, kneeling, crouching, and crawling, could tolerate occasional exposure to hazards and could frequently operate motor vehicles. Additionally, [Plaintiff] was limited to work comprised of simple, routine, repetitive tasks with a relaxed or flexible production rate requirement in the shift.

(R. at 798). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that during the relevant period, Plaintiff was unable to perform any past relevant work. (*Id.* at 806). At step five, based on Plaintiff's RFC, age, education, and the VE's testimony, the ALJ determined that during the relevant period, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed such as address clerk, account clerk, and telephone clerk. (*Id.* at 806–07). Accordingly, the ALJ concluded that during the period of June 1, 2009, through November 7, 2011, Plaintiff was not suffering from a disability, as defined by the Act. (*Id.* at 807–08).

Plaintiff did not file written exceptions with the AC, and the AC did not review the ALJ's decision on its own. (Mot. 2). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. 20 C.F.R. §§ 404.984(d), 416.1484(d).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh

evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks eviden-

tiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff began complaining of diarrhea, nausea, and vomiting in July 2009. (R. at 471). He was having profuse, bloody diarrhea, with about 15 loose bowel movements daily. (*Id.* at 352–53). On July 28, 2009, after three weeks of chronic diarrhea, he was admitted to Provena Saint Joseph Medical Hospital because of bloody diarrhea, renal failure, and dehydration, and was kept for observation and treatment until July 31. (*Id.* at 349, 355). Flashade M. Kareem, M.D., diagnosed bloody diarrhea, most likely inflammatory bowel disease (IBD), acute renal failure, insulin dependent diabetes mellitus, and hypertension, and prescribed Asacol and Flagyl.[4] (*Id.* at 349).

On July 16, 2009, after seeing Plaintiff every one to three months for almost three years for a variety of ailments, Linda Hushaw, APN,[5] completed a Medical Source Statement. (R. at 627–30). Plaintiff's symptoms included chronic fatigue, nausea/vomiting, abdominal pain, recurrent/persistent diarrhea, bowel incontinence, and weight loss. (*Id.* at 627). Hushaw opined that Plaintiff was incapable of

---

[4] Asacol (mesalamine) "is used to treat mildly to moderately active ulcerative colitis." Flagyl (metronidazole) "is used to treat bacterial infections." <drugs.com> (last visited August 25, 2016).

[5] An advanced practice nurse (APN) "is a nurse with post-graduate education in nursing." APN "defines a level of nursing practice that utilizes extended and expanded skills, experience and knowledge in assessment, planning, implementation, diagnosis and evaluation of the care required."
<https://en.wikipedia.org/wiki/Advanced_practice_registered_nurse> (last visited September 8, 2016).

even low-stress jobs because of frequent Crohn's disease flare-ups and hospitalizations. (*Id.* at 628). She also opined that Plaintiff needs to take unscheduled breaks every hour due to pain, fatigue, and diarrhea. (*Id.* at 629).

On August 14, 2009, Plaintiff denied any diarrhea since he was discharged from the hospital. (R. at 465). A physical examination of his abdomen was unremarkable. (*Id.* at 466). Laura Neilsen, PAC,[6] later co-signed by Yatin Shah, M.D.,[7] diagnosed ulcerative colitis, continued Asacol, and recommended that Plaintiff avoid spicy, fatty, and gas-producing foods, and other dietary triggers. (*Id.* at 467). On October 7, Neilsen prescribed ranitidine,[8] recommended that Plaintiff avoid spicy, fatty, gas-producing, and lactose-containing foods, and referred him to a gastroenterologist. (*Id.* at 463).

On February 2, 2010, a capsule endoscopy found only a few small erosions. (R. at 392). Kamran Ayub, M.D., noted that Plaintiff was doing well on Asacol. (*Id.* at 396). On March 4, Plaintiff complained of diarrhea, along with episodic abdominal pain not controlled by his medications, for which he was prescribed Norco.[9] (*Id.* at 446, 448). On April 6, Plaintiff reported a flare-up in his ulcerative colitis after eating peanuts and deviled eggs and requested a pain medication for his chronic ab-

---

[6] A certified physician assistant (PAC) "is a healthcare professional who practices medicine as a part of a healthcare team with collaborating physicians and other providers." <https://en.wikipedia.org/wiki/Physician_assistant> (last visited August 25, 2016).

[7] Dr. Shah also supervises APN Hushawf. (R. at 787).

[8] Zantac (ranitidine) "is used to treat and prevent ulcers in the stomach and intestines." <drugs.com> (last visited August 25, 2016).

[9] Norco, which contains a combination of acetaminophen and hydrocodone, "is used to relieve moderate to moderately severe pain." <www.drugs.com> (last visited August 26, 2016).

dominal discomfort. (*Id.* at 442). At the gastroenterologist's recommendation, the Norco dosage was increased and Florastor was prescribed.[10] (*Id.* at 442, 445). On May 6, Plaintiff reported an improvement in his abdominal pain and cramping but increased fatigue and nausea, for which promethazine was prescribed. (*Id.* at 438, 440). Around this time, Dr. Hamad prescribed Entocort for Plaintiff's Crohn's disease.[11] (*Id.* at 438).

On May 8, 2010, Plaintiff was hospitalized, complaining of frequent diarrhea with occasional bloody stools, uncontrolled nausea, and vomiting over the prior two weeks. (R. at 405, 407, 435). Ramalingappa Mukunda, M.D., assessed dehydration from Crohn's disease, diarrhea with exacerbation, diabetes mellitus, and hypertension. (*Id.* at 406). Plaintiff was treated with steroids, and after his symptoms improved, he was released with a referral to a gastroenterologist. (*Id.* at 404).

On June 3, 2010, Plaintiff complained of diarrhea and fatigue but denied nausea and vomiting. (R. at 435–36). On examination, APN Hushaw found inflammatory changes to Plaintiff's colon and ulcerative colitis. (*Id.* at 435). She opined that Plaintiff was unable to return to work because of weakness and frequent bowel movements related to his Crohn's disease. (*Id.* at 435). On June 14, Hushaw referred Plaintiff to a pain clinic for chronic pain syndrome. (*Id.* at 433). On August 26,

---

[10] Florastor (saccharomyces boulardii lyo) is a probiotic, which is prescribed "to prevent the growth of harmful bacteria in the stomach and intestines." <www.drugs.com> (last visited August 26, 2016).

[11] Entocort (budesonide) "is used to treat mild to moderate Crohn's disease." <www.drugs.com> (last visited August 26, 2016).

Plaintiff complained of chronic pain, which required daily narcotic usage to alleviate. (*Id.* at 590).

Plaintiff completed an Adult Function Report on July 6, 2010. (R. at 279–86). He asserted that his normal life has been "devastated" by his Crohn's disease. (*Id.* at 279). Because of recurrent flare-ups, which require a month to recover, and needing to stay within "eyesight" of a toilet, Plaintiff believes it would be impossible to keep a job. (*Id.*). He finds it difficult to sleep because of getting up three to five times with diarrhea. (*Id.* at 280).

On July 8, 2010, Kristie Shewmake, Plaintiff's spouse, completed a Third Party Function Report. (R. at 257–64). She asserted that Plaintiff never knows when he has to go to the bathroom. (*Id.* at 257, 261). Plaintiff is able to take short trips to the grocery store. (*Id.* at 260). When his Crohn's disease flares-up, he is unable to do any activities. (*Id.* at 262).

On August 31, 2010, Sarat Yalamanchili, M.D., performed a consultative examination on behalf of the Commissioner. (R. at 537–40). Plaintiff reported that he gets diarrhea three to four times daily from his Crohn's disease and suffers from occasional abdominal pain. (*Id.* at 537). His symptoms are generally helped by Asacol, but he lost 30 pounds during a major flare-up in June 2010. (*Id.*). An abdominal examination was unremarkable. (*Id.* at 538). Dr. Yalamanchili confirmed the Crohn's disease diagnosis and opined that Plaintiff would be unable to work because of his recurrent diarrhea. (*Id.* at 540).

On September 17, 2010, Francis Vincent, M.D., evaluated the medical record and performed a physical RFC assessment. (R. at 529–36). Dr. Vincent noted a history of Crohn's disease that causes Plaintiff to experience diarrhea three to four times daily. (*Id.* at 530). He opined that Plaintiff is capable of occasionally lifting 20 pounds, frequently lifting 10 pounds, and can stand, walk, or sit for six hours in an eight-hour workday with normal breaks. (*Id.* at 530). On January 6, 2011, David Mack, M.D., affirmed Dr. Vincent's assessment. (*Id.* at 623–25).

On October 5, 2010, Plaintiff completed a Disability Report for the Commissioner. (R. at 293–302). He asserted that his Crohn's disease has become progressively worse—his bowel movements have become more frequent and uncontrollable and he has abdominal cramps that "bend you over and make you wish you were dead." (*Id.* at 293). He can't do anything without fear of diarrhea and unbearable cramps. (*Id.* at 299).

On October 19, 2010, Plaintiff reported a flare-up of his Crohn's disease, complaining of diarrhea five to ten times daily, along with lower abdominal and back pain. (R. at 556). Karnran Ayub, M.D., diagnosed Crohn's disease and IBD and recommended a colonoscopy. (*Id.* at 556–57). Dr. Ayub noted that Plaintiff's Crohn's disease causes him at times to make frequent bathroom visits. (*Id.* at 550, 558).

The next day, on October 20, Plaintiff presented to the emergency room, complaining of constant, sharp abdominal 10/10 pain and cramping, moving from the left to right side, along with constipation and loose stools. (R. at 565, 567). An x-ray revealed a large amount of retained fecal debris but no bowel obstruction. (*Id.*). Dr.

Mukunda assessed Crohn's disease, likely exacerbated, hypertension, and diabetes mellitus. (*Id.* at 566). On October 27, Plaintiff reported persistent lower abdominal tenderness, which was confirmed on examination. (*Id.* at 583, 584).

On November 4, 2010, Plaintiff completed a second Function Report. (R. at 308–18). He complained that his Crohn's disease was worsening, with frequent episodes up to five times in an hour. (*Id.* at 308). His diarrhea and abdominal cramps negatively affect his ability to sleep at night. (*Id.* at 309). He has trouble bending over because it triggers a flare-up of his diarrhea. (*Id.* at 310). He's barely able to last a day without soiling his underwear. (*Id.* at 315).

A colonoscopy was performed on November 16, 2010. (R. at 619). Dong O. Kim, M.D., determined that Plaintiff has a normal right and descending colon, but with active proctitis.[12] (*Id.* at 618–19, 622).

On November 29, 2010, Plaintiff presented to Nikhil Bhargava, D.O., a digestive disease specialist, complaining of three to ten bowel movements daily, with rectal bleeding occurring once a week. (R. at 621). Dr. Bhargava reviewed the colonoscopy results and assessed Crohn's disease, extraintestinal manifestations of IBS, and hepatitis C. (*Id.* at 622). On February 28, 2011, Plaintiff complained of three to four bowel movements per day, with occasional diarrhea and rectal bleeding. (*Id.* at 673). He denied weight loss, nausea, or vomiting. (*Id.*). On examination, he was in no

---

[12] "Proctitis is an inflammation of the lining of the rectum. . . . Proctitis can cause rectal pain and the continuous sensation that you need to have a bowel movement. . . . Proctitis is common in people who have inflammatory bowel diseases." <http://www.mayoclinic.org/diseases-conditions/proctitis/basics/definition/con-20027855> (last visited September 8, 2016).

acute distress. (*Id.*). Dr. Bhargava reviewed December 2010 tests, which indicated that Plaintiff's small bowel follow-through was unremarkable and his abdomen and pelvis showed no acute solid organ pathology. (*Id.*). Dr. Bhargava assessed diarrhea with history of Crohn's disease, but found it unclear whether Plaintiff's current symptoms were an exacerbation of his Crohn's disease versus IBS versus narcotic-related bowel issues. (*Id.*). Dr. Bhargava continued Asacol and ordered a colonoscopy for March 14. (*Id.*).

On March 1, 2011, after seeing Plaintiff every one to three months over the previous four years, APN Hushaw opined that Plaintiff's impairments, including ulcerative colitis and Crohn's disease, would cause him to be absent from work more than four days per month. (R. at 633). She also opined that Plaintiff's pain would frequently interfere with the attention and concentration needed to perform even simple work tasks. (*Id.*).

On March 21, Plaintiff reported three to four bowel movements per day in the morning, which are nonbloody. (R. at 672). His abdominal pain was well controlled and he denied any nausea, vomiting, or weight loss. (*Id.*). A small bowel follow through[13] and a CAT scan were unremarkable. (*Id.*). The colonoscopy found mildly active chronic colitis and hyperplastic colonic mucosa. (*Id.*). Dr. Bhargava assessed Crohn's disease with mainly Crohn's colitis and continued Asacol and Canasa sup-

---

[13] A "small bowel follow through" is an x-ray exam of the stomach and the upper section of the small intestine. <https://www.peacehealth.org/peace-harbor/services/imaging-services/radiology/Pages/small-bowel-follow-through> (last visited September 9, 2016).

positories.[14] (*Id.*). On June 6, Plaintiff reported three to five nonbloody bowel movements per day, which were mushy to watery. (*Id.* at 671). Dr. Bhargava assessed Crohn's disease with mild symptoms and continued mesalamine. (*Id.*). On August 22, Plaintiff reported three to five bowel movements daily, which were well-formed and nonbloody. (*Id.* at 756). His weight was stable and he denied nausea or vomiting. (*Id.*). On examination, his abdomen was unremarkable with normal bowel sounds. (*Id.*). Dr. Bhargava assessed Crohn's disease, which he suspected was secondary to diabetes, and continued Asacol and mesalamine as needed. (*Id.*). On September 30, Plaintiff reported five to ten bowel movements daily, with scant rectal bleeding, along with abdominal bloating. (*Id.* at 785). Dr. Bhargava assessed bloating and Crohn's disease, along with possible IBS with diarrhea, and continued Asacol and Canasa. (*Id.*).

On September 16, 2011, after treating Plaintiff every one to three months since November 2006, Dr. Shah completed a Medical Source Statement. (R. at 765–68). He reiterated that Plaintiff has severe, chronic abdominal and back pain, which range in severity from 6–8/10 and which has not been completely relieved with medication. (*Id.* at 765). Dr. Shah concluded that Plaintiff's diarrhea causes anxiety and pain, which are exacerbated by moderate to high levels of stress. (*Id.* at 767). He opined that Plaintiff's impairments would likely cause him to miss more than three days of work per month. (*Id.* at 768).

---

[14] Canasa (mesalamine) "is used to treat ulcerative colitis, proctitis, and proctosigmoiditis, . . . [and] to prevent the symptoms of ulcerative colitis from recurring." <www.drugs.com> (last visited September 9, 2016).

On January 20, 2012, Plaintiff was admitted to Riverside Medical Center for three days after experiencing a large, bloody bowel movement. (R. at 1045). After he was admitted, he complained of cramping and bloating. (*Id*. at 1046). Brian C. Sasso, D.O., a gastroenterologist, assessed Crohn's colitis, currently with exacerbation and lower gastrointestinal bleeding, along with nausea and vomiting, possible diabetic gastroparesis. (*Id*. at 1045). In May 2012, Dr. Sasso performed a colonoscopy, which showed moderate to severe Crohn's colitis with ulceration, inflammation, pseudopolyps, and hemorrhage. (*Id*. at 1054). Plaintiff was admitted again on May 18 to Riverside Medical, after several episodes of rectal bleeding earlier in the day. (*Id*.). He reported six successive bowel movements, all containing blood. (*Id*.). Daniel Errampalli, M.D., assessed Crohn's colitis exacerbation and anemia. (*Id*. at 1056).

On October 15, 2014, Sai Nimmagadda, M.D., a nonexamining medical expert, reviewed the medical record and responded to certain interrogatories at the request of the ALJ. (R. at 1058–69). Dr. Nimmagadda opined that for the period of June 2009 through November 2011, despite multiple recurrent hospitalizations, emergency room visits, and five to ten bowel movements daily, Plaintiff did not have any complications associated with his Crohn's disease. (*Id*. at 1069). He further concluded:

> There are clearly clinic notes and treatment sources that confirm the chronic status of intermittent Crohn's disease here. [Plaintiff] continues to have some intermittent flares and has been hospitalized. The issue here would be the intermittent use of the restroom for the increased frequency of stools noted.
>
> Suggest that at least a sedentary RFC be used here with the back pain and the fatigue being a factor here. The breaks could be within the normal work day and I don't see that the treatment has been optimized

in regards to the Crohn's disease. Without [m]ajor complications I don't see how we can restrict the RFC further.

(*Id.*).

At the March 2015 hearing, Plaintiff testified that during the relevant period, he was having diarrhea 10–20 times daily. (R. at 1079, 1082). He wore adult diapers because sometimes he could not make it to the bathroom in time. (*Id.* at 1079–80). He was not able to determine what aggravating factors contributed to more episodes in some days than others. (*Id.* at 1081). After his hospitalizations, it took him several weeks "to be normal again." (*Id.* at 1083).

## V. DISCUSSION

Plaintiff contends that (1) the ALJ's credibility assessment was not supported by substantial evidence, and (2) the ALJ's RFC assessment was flawed because it did not account for his frequent diarrhea and resultant bathroom breaks. (Dkt. 17 at 7).

### A. The ALJ's Credibility Determination Is Patently Wrong

The Social Security Administration determined recently that it would no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of [the claimant's] symptoms." Social Security Ruling (SSR) 16-3p, at *2.[15] "The change in wording is meant to clarify that

---

[15] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original).

The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2; *see also* 20 C.F.R. § 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." SSR 16-3p, at *2.

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562

(citing 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 16-3p, like former SSR 96-7p, requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Id.*

Plaintiff testified that he was unable to work during the relevant period because he was having diarrhea 10–20 times daily. (R. at 1079, 1082). He wore adult diapers

because sometimes he could not make it to the bathroom in time. (*Id.* at 1079–80). After his frequent hospitalizations, it took him several weeks to "to be normal again." (*Id.* at 1083).

In his decision, the ALJ found that Plaintiff's allegations "are not entirely credible." (R. at 798). The ALJ concluded that Plaintiff's

> allegations of symptoms consistent with Crohn's disease including stomach cramps and pain, fecal incontinence causing him to soil himself, and diarrhea resulting in frequent bowel movements with reports of as many as fifteen per day, are not accepted as alleged because those allegations are not consistent with the objective medical evidence available to me.

(*Id.* at 801). Specifically, he observed that Plaintiff's care was generally routine except for the exacerbations during which he was hospitalized, his complaints were inconsistent with his activity level, his dietary noncompliance contributed to his flare-ups, and his symptoms improved with treatment. (*Id.* at 801–04).

> In light of the . . . evidence of [Plaintiff's] improvement in symptomology with appropriate treatment, the exceedingly infrequent documented flares, the lack of evidence of consistently documented symptomology such as abdominal pain or bowel movements of sufficient severity and chronicity to preclude sustaining work activity, the inconsistencies of [Plaintiff's] testimony with his documented activity level during the period in question, and the extent to which dietary non-compliance played a role in periods of increased symptomology, [the ALJ was] unable to conclude that [Plaintiff] was limited during the period in question beyond [the assessed RFC]. To the extent that [Plaintiff's] allegations are inconsistent with that assessment, those allegations are not accepted as alleged.

(*Id.* at 804).

While the ALJ is correct that there is no evidence of Plaintiff "soiling himself or having to wear sanitary undergarments to prevent such a situation from occurring"

(R. at 803), none of the other reasons provided by the ALJ for rejecting Plaintiff's credibility are legally sufficient or supported by substantial evidence. First, the medical record demonstrates that during the relevant time period, Plaintiff consistently complained of chronic, uncontrolled diarrhea with associated pain. (R. at 352–53 (profuse, bloody diarrhea, with about 15 loose bowel movements daily, in July 2009), 446–48 (diarrhea, along with episodic abdominal pain, in March 2010), 442 (chronic abdominal pain in April 2010), 405–07 (hospitalized for frequent diarrhea and occasional bloody stools in May 2010), 590 (chronic abdominal pain in August 2010), 537 (diarrhea three to four times daily along with occasional abdominal pain in August 2010), 556 (diarrhea five to ten times daily in October 2010), 565–67 (constant, sharp abdominal 10/10 pain and cramping in October 2010), 583–84 (persistent lower abdominal tenderness in October 2010), 621 (three to ten bowel movements daily, with occasional rectal bleeding, in November 2010), 673 (three to four bowel movements daily, with occasional diarrhea and rectal bleeding in February 2011), 671 (three to five mushy to watery bowel movements daily in June 2011), 785 (five to ten bowel movements daily, with rectal bleeding and abdominal bloating in September 2011)). Plaintiff's complaints were corroborated by his treating sources' examinations and diagnoses. (*Id.* at 349 (diagnosing bloody diarrhea, most likely inflammatory bowel disease, and acute renal failure), 467 (diagnosing ulcerative colitis), 406 (assessing dehydration from Crohn's disease and diarrhea with exacerbation), 435 (finding inflammatory changes to the colon and ulcerative colitis), 556–57 (diagnosing Crohn's disease and IBD), 565–67 (x-ray revealed large amount of re-

tained fecal debris and assessing Crohn's disease, likely exacerbated), 583–84 (finding abdominal tenderness), 618–22 (finding active proctitis), 622 (reviewing colonoscopy and assessing Crohn's disease and extraintestinal manifestations of IBS), 673 (assessing diarrhea with history of Crohn's disease), 672 (finding mildly active chronic colitis and hyperplastic colonic mucosa and assessing Crohn's disease with mainly Crohn's colitis), 785 (assessing bloating and Crohn's disease with possible IBS with diarrhea)). Medical evidence subsequent to the relevant period contradicts the ALJ's conclusion that Plaintiff's symptoms had improved with treatment. (*Id.* at 1045 (assessing Crohn's colitis, with exacerbation and lower gastrointestinal bleeding, along with nausea, vomiting, and possible diabetic gastroparesis in January 2012), 1054 (colonoscopy showing moderate to severe Crohn's colitis with ulceration, inflammation, pseudopolyps, and hemorrhage in May 2012), 1056 (assessing Crohn's colitis exacerbation and anemia after being admitted to hospital in May 2012 because of several episodes of rectal bleeding)). The ALJ must consider all relevant evidence, even circumstantial evidence that postdates the relevant period. *See Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010).

Second, Plaintiff's treating physicians periodically changed his prescriptions in a largely futile attempt to address his symptoms. (R. at 463 (prescribing ranitidine to prevent ulcers), 446–48 (prescribing Norco for pain), 442–45 (Norco dosage increased and Florastor prescribed for abdominal issues), 438–40 (promethazine prescribed to control pain and nausea), 438 (Entocort prescribed for Crohn's disease)). In any event, during the time period in 2011 when his physicians largely main-

tained the Asacol and mesalamine prescriptions, Plaintiff's symptoms never disappeared—he continued to report up to ten bowel movements daily, with occasional diarrhea and rectal bleeding. (*Id.* at 671, 785). In November 2011, Dr. Shah asserted that Plaintiff's severe, chronic abdominal pain which ranges in severity from 6–8/10, has not been completely relieved with medication. (*Id.* at 767). And two months after the relevant period, Plaintiff was admitted to the hospital after experiencing a large, bloody bowel movement. (*Id.* at 1045).

Third, the ALJ's conclusion that Plaintiff's impairments must not be as serious as alleged because of occasional dietary noncompliance is not supported by any medical evidence. There is no opinion testimony or other medical evidence to suggest that his symptoms were significantly exacerbated by Plaintiff occasionally having foods that aggravate his symptoms. Although the Court recognizes that the ALJ's opinion is entitled to considerable deference, such deference does not extend to him "playing doctor." *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("We have recognized that an ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so."); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Further, the ALJ's reasoning seemingly ignores Plaintiff's testimony that neither he nor his doctors have ever identified a consistent pattern between certain foods and symptom flare-ups. (R. at 1081).

Finally, the ALJ does not adequately explain how Plaintiff engaging in activities like camping and swimming undermines his claims of chronic and severe diarrhea. While it is permissible for an ALJ to consider a claimant's daily activities when assessing credibility, the Seventh Circuit has repeatedly instructed that ALJs are not to place "undue weight" on those activities. *Moss*, 555 at 562; *see Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("[The claimant's] ability to struggle through the activities of daily living does not mean that [the claimant] can manage the requirements of a modern workplace."); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). The ALJ did not inquire whether there were nearby bathrooms that Plaintiff could use as needed while camping and swimming. *Moon*, 763 F.3d at 721 ("the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination"). And unlike most occupations which limit the number and length of bathroom breaks that an employee can take—as the VE testified (R. at 1102–03)—a person engaged in leisure activities is free to take as many breaks as necessary to attend to his bodily needs.

The Commissioner contends that Plaintiff's "demonstrated ability to engage in [substantial gainful activity until 2008] and his receipt of unemployment benefits until July 2011 contradict his claim of disabling symptoms." (Dkt. 20 at 5). The Court, however, must limit its review to the rationale offered by the ALJ. *See SEC*

*v. Chenery Corp.*, 318 U.S. 80, 90–93 (1943); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("the government's brief and oral argument . . . seem determined to dissolve the *Chenery* doctrine in an acid of harmless error"). And here, the ALJ did not base his RFC determination on Plaintiff's prior gainful activity or his receipt of unemployment benefits. Further, the receipt of unemployment benefits is not dispositive. *Cf. Schmidt v. Barnhart,* 395 F.3d 737, 746 (7th Cir. 2005) (ALJs may rely on this ability-to-work certification as "*one of many factors* adversely impacting [the claimant's] credibility.") (emphasis added); *accord Lott v. Colvin,* 541 F. App'x 702, 707 (7th Cir. 2013), *as amended* (Oct. 17, 2013). And while collecting unemployment insurance benefits might have some bearing on credibility, an ALJ cannot consider ability-to-work certifications and job applications to evaluate the evidence unless the ALJ also addresses—which he did not do here—any reasons that the claimant provides for his actions. *Richard v. Astrue,* 370 F. App'x. 727, 732 (7th Cir. Apr. 13, 2010).

The Court finds the ALJ's credibility determination "patently wrong." *Craft*, 539 at 678. On remand, the ALJ shall reevaluate Plaintiff's complaints with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## B. The RFC Did Not Properly Account for Plaintiff's Bathroom Breaks

Plaintiff contends that the ALJ failed to properly assess his RFC. (Dkt. 17 at 7–10). He argues that the "ALJ failed to account for [his] frequent, unpredictable bouts of diarrhea and the resultant off-task time caused by such frequent bathroom

breaks." (*Id.* at 8). Plaintiff asserts that regardless of whether the ALJ's credibility determination was properly reached, he should have quantified the number and length of bathroom breaks required by Plaintiff's diarrheal emergencies. (*Id.* at 9).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft*, 539 F.3d at 676. In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

The ALJ determined that during the relevant period, Plaintiff's severe impairments included Crohn's disease. (R. at 794). After examining the medical evidence

and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that during the relevant period, Plaintiff could have performed a limited range of sedentary work. (*Id.* at 798). The ALJ accommodated "the frequency of [Plaintiff's] bowel movements" (*id.* at 803) by limiting him to "work comprised of simple, routine, repetitive tasks with a relaxed or flexible production rate requirement in the shift" (*id.* at 798). Based on the ALJ's RFC assessment and the VE's testimony, the ALJ determined that during the relevant time period, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed such as address clerk, account clerk, and telephone clerk. (*Id.* at 806–07).

Even if the ALJ properly discounted Plaintiff's descriptions of his impairments, the medical record contains substantial evidence—as discussed above—that Plaintiff suffered from persistent and recurrent diarrhea that frequently caused him to go to the bathroom an inordinate number of times per day. He had been hospitalized three times for diarrhea (sometimes bloody), nausea, and vomiting. (R. at 349, 403, 564). His treating sources opined that because of his chronic diarrhea, he would need frequent bathroom breaks. (*Id.* at 628–29 (APN Hushaw opining that Plaintiff needs to take an unscheduled break every hour due to pain, fatigue, and diarrhea), 765–68 (Dr. Shaw opining that Plaintiff's severe, chronic diarrhea causes anxiety and pain), 550–58 (Dr. Ayub opining that Plaintiff's Crohn's disease causes him at times to make frequent bathroom breaks)). The Commissioner's consultative

examiner, Dr. Yalamanchili, also opined that Plaintiff would be unable to work because of recurrent diarrhea. (*Id.* at 540).

The ALJ concluded that Plaintiff's diarrhea did not warrant "accommodations beyond a relaxed or flexible production rate." (R. at 803). But as the VEs testified at both of Plaintiff's hearings, the issue with diarrhea and bathroom breaks is not the pace that one can work; instead, it is the number of breaks and the length of each break. Diarrhea, by definition, "denotes not merely abnormal looseness of stools but also an increase in the urgency and frequency of defecation." *Stedman's Medical Dictionary* 245010. As the VE explained at the March 2015 hearing,

> the individual needs to be on task and functioning an [*sic*] minimum of 85 percent of the work time in order to sustain even simple, unskilled work. And those chunks of off-task time cannot be for more than five or six minutes per chunk or ultimately during that portion of the work day they're not getting the work done in a timely fashion and would get written up and terminated.

(R. at 1101); (*see also id.* at 83) (VE at September 2011 hearing stating that any breaks beyond standard allowances would not be tolerated). Despite this testimony, the ALJ did not quantify how frequently Plaintiff would need to go to the bathroom during a workday, and for how long each time.

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ, based on the medical evidence, shall determine the amount and length of

breaks Plaintiff will require during a work day and include such information in Plaintiff's RFC and the hypotheticals posed to the VE.

## C. Summary

On remand, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there were jobs that existed in significant numbers that Plaintiff could have performed during the relevant period.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's request for reversal is **GRANTED**, and Defendant's Motion for Summary Judgment [19] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: November 28, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge